# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 31 2017, 10:48 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, IN

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, IN

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Clair Eugene Chaplin, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff* | October 31, 2017 <br><br> Court of Appeals Case No. 31A05-1604-CR-779 <br><br> Appeal from the Harrison Superior Court <br><br> The Honorable Joseph L. Claypool, Judge <br><br> Trial Court Cause No. 31D01-1507-MR-424 |

**Vaidik, Chief Judge.**

# Case Summary

Clair Eugene Chaplin appeals his murder conviction, arguing that the trial court erred in admitting the testimony of a cellular-forensics analyst, who testified concerning the likely locations of Chaplin's cell phone during the twenty-six-hour period surrounding the victim's death. We need not reach this issue. Even if the trial court erred in admitting the analyst's testimony, we are satisfied that Chaplin's conviction is supported by independent evidence of guilt such that there is no substantial likelihood that the analyst's testimony contributed to the jury's verdict. Accordingly, any error is harmless. We therefore affirm Chaplin's murder conviction.

# Facts and Procedural History

In 2014, Chaplin and his wife of twenty-seven years, Paula, were living in New Albany in Floyd County. New Albany is in southern Indiana on the Ohio River. That summer, Paula let Geneieve Rogge move into their home. Paula was friends with Geneieve's mother and had known Geneieve since she was a young girl. Geneieve was addicted to heroin, and Paula thought that she could help Geneieve beat her addiction. After Geneieve had been living at Paula and Chaplin's house for about six months, Paula caught Chaplin and Geneieve in bed together. Paula kicked Geneieve out of their house.

Chaplin and Geneieve continued their sexual relationship. Because it appeared that Paula and Chaplin might get a divorce, Chaplin's boss, Chuck Jones, told

Chaplin that he could stay at a travel trailer that was parked behind a warehouse that he owned on Corydon Pike Road in New Albany. Chaplin, however, let Geneieve stay there. Chaplin became Geneieve's "sugar daddy," giving her heroin, a car, a cell phone, clothes, and money—"just enough [of the] things that she didn't have." Tr. p. 321.

[4] But things quickly changed in April 2015 when Geneieve's boyfriend, Mark Smith, was released from jail after serving a one-year sentence. Geneieve and Mark resumed their relationship, and Chaplin became jealous of the younger Mark. Chaplin complained to Geneieve's best friend, Robin Bethards, that he did not understand why Geneieve wanted to be with Mark because Mark could not give her the things that he could. Mark knew that Geneieve was also having a sexual relationship with Chaplin, but he decided to let things "play out" until he got back on his feet and could get a place for the two of them to live. *Id.* at 386.

[5] Around the middle of June, Chaplin invited Mark to lunch. The two men met "at White Castles" and concocted a plan to "corner" Geneieve and make her choose between them. *Id.* at 387. The next day, Chaplin and Mark executed their plan, and Geneieve declared that she loved Mark and wanted to marry him and that she was "just friends" with Chaplin. *Id.* at 388.

[6] On Saturday, June 27, Chaplin tried several times to get a hold of Geneieve. His texts to her started out harmless, such as "Hey, where you at? I want to pick you up" and "Hey, where you at? I need to pick you up. We got things to

do." *Id.* at 608. When Geneieve did not respond, Chaplin texted both Robin and Mark looking for her. Chaplin also stopped by Robin's house unannounced, which was unusual. According to Robin, Chaplin was "irritated." *Id.* at 361. When Chaplin still could not get in touch with Geneieve, the tenor of his texts changed. They now read, "Some kind of girlfriend. Won't even call me back or text me," "This is a crock of s***. You won't call me back or text me," and "Are you having a good time with Mark?" *Id.* at 608-09; *see also* Ex. 11A.[1]

[7] In the meantime, as Chaplin suspected, Geneieve was with Mark. Mark had picked up Geneieve around 3 p.m. They went to the river, shot some heroin, and "made love" on a blanket. Tr. p. 389. They then drove around town. While they were driving around, Robin texted Mark to let him know that Chaplin was looking for Geneieve and that Chaplin suspected the two of them were together. Mark and Geneieve returned to the river, where they shot more heroin and "made love again" on a blanket. *Id.* at 391. When it was starting to get dark, Mark dropped off Geneieve a couple blocks away from the travel trailer on Corydon Pike Road. Geneieve did not want Mark to drop her off at the trailer because she knew that Chaplin had been looking for her. Because Geneieve did not have keys to the trailer, she texted Chaplin several times between 9 and 10 p.m. asking him to come let her in.

---

[1] Chaplin deleted the call log and text messages dated Saturday, June 27, from his cell phone. *See* Tr. p. 612. Detective Smith obtained the text messages from Chaplin's cell-phone company, Verizon.

[8] Around 9 p.m., Chaplin and Paula rented several movies at Family Video. They returned home and had just started the first movie when Chaplin abruptly told Paula that the movie was "no good" and left. *Id.* at 461. He told Paula that he was going to the warehouse to work. Paula did not see or hear from Chaplin again that night. About twenty minutes after Mark dropped off Geneieve, she called him to let him know that Chaplin was on his way to let her in the travel trailer. That was the last time that Mark heard from Geneieve.

[9] Paula next heard from Chaplin on Sunday morning, when he called and asked her to meet him for breakfast at Waffle House at 8:30 a.m. When they met, Paula noticed "marks down [Chaplin's] neck and bruises on his chin and a place on his arm." *Id.* at 465. He also had a "big wide" bandage across his right arm. *Id.* Chaplin, who did not have these injuries the night before, told Paula that he fell at the warehouse.

[10] That Sunday afternoon, an Indiana Conservation Officer responded to a 911 caller who had located a female body in the Ohio River near the boat ramp at Morvin's Landing in Mauckport in Harrison County, which is west of Floyd County. The body was dressed in only a bra and underwear. The conservation officer contacted the Harrison County Sheriff's Department. The conservation officer immediately noticed injuries to the body, including "purplish, reddish marks" on the neck, a "dark purplish color" to the face, and a distinct pattern of lividity to the backside (lines that met in a "V"), all of which were inconsistent with accidental death by drowning. *Id.* at 96. The body was transported to Harrison County Hospital for an autopsy, which was conducted on June 30.

During the autopsy, tattoos on the body were compared to driver's license photographs in the BMV database, and the body was identified as Geneieve's. A second autopsy was conducted on July 1 in Louisville. The forensic pathologist determined that the cause of death was strangulation; the pathologist also noted multiple blunt-force injuries to Geneieve's head, neck, torso, and extremities. The pathologist opined that the pattern of lividity to Geneieve's backside indicated that she was lying on a hard surface before she was found in the water.

[11] As soon as the first autopsy was completed on June 30, Harrison County Sheriff's Department Detective Nick Smith began contacting Geneieve's friends. When Detective Smith called Chaplin, he initially did not tell him that Geneieve was dead; instead, he asked Chaplin when he had last seen her. Chaplin responded that he had last seen Geneieve on Saturday morning. Detective Smith asked Chaplin if he could go to the travel trailer to see Geneieve's personal belongings. Chaplin, however, said that he had gone to the trailer on Saturday night and that her belongings had already been "removed." *Id.* at 518. Chaplin spoke of Geneieve in the past tense, which "stood out" to the detective since he had not yet told Chaplin about Geneieve's death. *Id.* at 495. Chaplin asked Detective Smith not to tell his wife about their conversation or about his relationship with Geneieve. When Detective Smith finally told Chaplin that Geneieve was dead, Chaplin displayed "[n]o emotion," as opposed to Mark and Robin, who cried and were hysterical when they were told about Geneieve's death. *Id.* at 513-14. Detective Smith called

Chaplin back later that day and asked him to come in for an interview, but Chaplin said that he was on his way to Florida and had already driven too far to turn around. The detective, however, spoke with Paula, who said that Chaplin was on his way to West Virginia to visit family, not Florida. In any event, during this second phone call with Detective Smith, Chaplin claimed that he did not enter the travel trailer until Sunday or Monday. Detective Smith contacted Chaplin's boss, Chuck, who gave him permission to search the trailer.

[12] Upon searching the travel trailer, Detective Smith observed signs of a struggle inside. There were red fibers everywhere. A decorative glass lamp shade was missing from a wall sconce and a fire extinguisher had been removed from its mount and was lying on the floor. A set of blinds was missing from a window. In addition, there were blood stains on the floor beneath the missing lamp shade and on the wall beneath the fire-extinguisher mount. Blood stains were also found elsewhere on the floor, on the couch, and on a couch pillow. Finally, there were blood stains and broken pieces of decorative glass in the bathroom sink. It was later determined that the blood on the wall by the fire-extinguisher mount and in the sink contained Chaplin's DNA and that the blood on the couch and the pillow contained a mixture of Chaplin's and Geneieve's DNA.

[13] Detective Smith also searched the warehouse near the travel trailer. He found a bucket of cleaning supplies that Chuck did not recognize. Inside the bucket was a red-colored feather duster that was consistent with the red fibers discovered

inside the trailer. Chaplin's older model red-and-white-striped Ford F-150 truck was also inside the warehouse. Detective Smith noticed that a portion of the bed liner was cleaner than the rest and that there was standing water in the truck bed. According to Detective Smith, it appeared that a power washer had been used. Detective Smith also noticed that Chaplin's bed liner had a distinct "V" pattern, causing him to immediately say, "That's the hard object that created th[e] lividity" on Geneieve's body. *Id.* at 579.

[14] Detective Smith also searched a dumpster at a different property that Chuck owned and where Chaplin also did some work. Detective Smith found a set of blinds inside the dumpster that matched the set that was missing from the travel trailer. The blinds contained blood stains that were later determined to contain Chaplin's DNA.

[15] Based on the investigation, Detective Smith believed that Geneieve's body had been "dumped somewhere along the banks of the Ohio River on the Indiana side" and that Chaplin was responsible for her death. *Id.* at 730. Accordingly, he contacted Horseshoe Southern Indiana casino to obtain its surveillance video to see if Chaplin's distinct-looking truck had passed by, as that was the most direct route to the Ohio River. After reviewing "[h]ours and hours and hours" of video, Detective Smith located a truck that appeared to be Chaplin's driving west on Highway 111 at 11:36 p.m. in the direction of Evans Landing, a twenty-four-hour accessible boat ramp. *Id.* at 733. As the truck passed the casino, a large, light colored object was visible in the truck bed. At 12:25 a.m., Detective Smith located the same truck driving east on Highway 111. Due to

the angle of the camera, it could not be determined whether the object was still in the truck bed. *See id.* at 737.

[16] Chaplin was arrested on July 15 and charged with Geneieve's murder. At the time of his arrest, Detective Smith took pictures of Chaplin's injuries, which were in the healing stages. One of the injuries was a bite mark to his right arm. Exs. 17D & 17E. The bite mark was consistent with a human bite mark and "in a location that in a case of strangulation [is] where you [would] expect to see a human bite, if the individual is able to fight back." Tr. p. 874.

[17] A jury trial was held in January 2016. At trial, the State called Justin Ogden, a cellular-forensics analyst from Virginia, to provide the likely locations of Chaplin's cell phone during the twenty-six-hour period surrounding Geneieve's death. Ogden testified that he took data from Chaplin's cell-phone company, Verizon, including where a given cell tower/site was located, which side of the tower was used for a particular transaction, and the distance of Chaplin's cell phone from the tower for each transaction. *See id.* at 671. He then used that data to come up with defined areas on a map, which he called "likely areas," for Chaplin's cell phone during that twenty-six-hour period. Ogden generated approximately twenty-three maps in this case; some maps covered time ranges while other maps covered a specific minute. These "likely areas" contained the following locations of Chaplin's cell phone relevant to Geneieve's murder:

8:40-8:53 p.m. (Saturday, June 27): Family Video

8:56 p.m.: Chaplin's home with Paula

8:59-10:21 p.m.: Chaplin's home with Paula

10:35-11:16 p.m.: Corydon Pike Road near travel trailer

11:26-11:27 p.m.: Highway 111 moving west

11:36 p.m.: Horseshoe Southern Indiana casino

11:44-11:58 p.m.: Highway 111 moving west

12:01 a.m. (Sunday, June 28): Highway 111 near Evans Landing

12:04-12:36 a.m.: Highway 111 moving east

12:58-1:23 a.m.: Corydon Pike Road near travel trailer

2:24-7:01 a.m.: Chaplin's home with Paula

7:32-8:05 a.m.: Corydon Pike Road near travel trailer

8:13-9:27 a.m.: Waffle House

The jury found Chaplin guilty of murder, and the trial court sentenced him to fifty-six years.

[18] Chaplin now appeals.

# Discussion and Decision

[19]    Chaplin contends that the trial court erroneously admitted Ogden's testimony concerning the likely locations of Chaplin's cell phone during the twenty-six-hour period surrounding Geneieve's death in violation of Indiana Evidence Rule 702(a) and (b). We need not address this issue, however, because even if the trial court erred in admitting Ogden's testimony, we find that any error is harmless.

[20]    Not every trial error requires reversal. *See Lewis v. State*, 34 N.E.3d 240, 248 (Ind. 2015). That is, the erroneous admission of evidence does not require reversal unless it prejudices the defendant's substantial rights. *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014). To determine whether an error in the introduction of evidence affected the defendant's substantial rights, we assess the probable impact of that evidence upon the jury considering all the other evidence that was properly presented. *Id.* If we are satisfied that the conviction is supported by independent evidence of guilt such that there is no substantial likelihood that the challenged evidence contributed to the verdict, the error is harmless. *Id.*

[21]    The record shows that Chaplin had a sexual relationship with Geneieve, was jealous of her renewed relationship with Mark, was fervently trying to locate Geneieve the day of her murder, and suspected that she was with Mark. After Mark dropped off Geneieve near the travel trailer on Corydon Pike Road that night, Geneieve texted Chaplin asking him to let her in the trailer. At about the

same time, Chaplin abruptly told his wife that he was going to the warehouse to work. The travel trailer was located behind the warehouse. Geneieve called Mark to tell him that Chaplin was on his way to let her in.

[22] Inside the travel trailer, police found signs of a struggle and multiple blood stains containing either Chaplin's DNA or a mixture of Chaplin's and Geneieve's DNA.[2] In the middle of the night, a truck that appeared to be Chaplin's was caught on surveillance camera at Horseshoe Southern Indiana casino heading in the direction of a twenty-four-hour accessible boat ramp on the Ohio River. There was a large, light-colored object visible in the bed of the truck. A short time later, the truck was again captured driving in the opposite direction. Chaplin's truck was later found inside the warehouse, and the area of the truck bed where the object was seen had been recently cleaned, most likely with a power washer. The backside of Geneieve's body displayed a pattern of lividity matching the pattern of Chaplin's bed liner, indicating that her body had been resting on that hard surface after her death but before she was placed in the river.

[23] The following morning, Chaplin's wife observed fresh injuries on him that were not there the night before. One of those injuries was to his right arm, but it was concealed by a large bandage. When Chaplin was arrested a couple weeks

---

[2] Chaplin makes much of the fact that his DNA was not recovered from Geneieve's body. But the DNA analyst testified that "floating down the river for a period of time" "could definitely wash off the DNA for sure." Tr. p. 928; *see also id.* at 951.

later, that injury was consistent with a human bite mark, and it was in a location where a strangulation victim might bite an attacker. When Chaplin spoke with police after Geneieve's body was discovered, he told several lies. He also spoke about Geneieve in the past tense before he was told she was dead.

[24] We are satisfied that Chaplin's murder conviction is supported by independent evidence of guilt such that there is no substantial likelihood that Ogden's testimony contributed to the jury's verdict. Accordingly, any error is harmless.

[25] Affirmed.

Bailey, J., and Robb, J., concur.